HERBKO INTERNATIONAL, INC., Plaintiff,

v.

GEMMY INDUSTRIES CORP., Defendant.

No. 95 Civ. 9848 (SHS).

United States District Court, S.D. New York.

Feb. 26, 1996.

Michael Aschen, Abelman Frayne & Schwab, New York City, for plaintiff.

Gerard F. Dunne, New York City, for defendant.

## OPINION AND ORDER

STEIN, District Judge.

Herbko International, Inc. brought this action against Gemmy Industries Corp. alleging, among other claims, that Gemmy's "CROSSWORD CADDY" game board infringed the design patent and trade dress of Herbko's "CROSSWORD COMPANION" game board and that Gemmy engaged in false advertising as well. By order to show cause dated December 8, 1995, Herbko moved for a preliminary injunction prohibiting the continuation of those alleged violations. Oral argument on that motion, including the submission of evidence, took place on February 2, 1996. After reviewing the evidence, the Court finds that Herbko has failed to meet its burden for a preliminary injunction. Accordingly, plaintiff's motion for a preliminary injunction is denied.

### I. BACKGROUND

In January of 1994, Herbko began marketing a hand held game board identified by its registered trademark "CROSSWORD COMPANION." (Sternberg Aff., ¶ 5.) The game contains a scroll of *New York Times* crossword puzzles within a plastic body that is designed to permit users to work on the puzzles anywhere. (Plaintiff's Exhibit 1.) When a puzzle is completed, or the player

despairs of doing so, he or she can advance the scrolling device to reveal the answers to the puzzle and begin a new puzzle. Herbko's "CROSSWORD COMPANION" became available in retail stores in October of 1994 and had retail sales of approximately $3 million during the remainder of the year and approximately $12 million during 1995. (Sternberg Aff., ¶ 1; Sternberg Reply Aff., ¶ 3.) A design patent was issued to Herbko in October of 1995. (Sternberg Aff., ¶¶ 2, 4.)

Herbko became aware of Gemmy's product in approximately July of 1995 and wrote letters to its retailers expressing concern about a potential infringer. (Sternberg Aff., ¶ 11 & Exhibit 6.) Herbko requested that Gemmy forward a prototype of its product to Herbko for comparison and offered to inform Gemmy of its conclusions regarding infringement. (Sternberg Aff., ¶ 9; Defendant's Exhibit F.) Gemmy forwarded its product to Herbko and Herbko then brought this action and moved for a preliminary injunction. The parties subsequently agreed to waive the presentation of live witnesses and have plaintiff's motion decided based upon their motion papers and the evidentiary submissions and legal arguments made on February 2, 1996.

## II. *DISCUSSION*

### A. *Design Patent Infringement*

■ Herbko claims that Gemmy's "CROSSWORD CADDY" infringes upon Herbko's design patent for its "CROSS-WORD COMPANION" and that it is entitled to injunctive relief pursuant to 35 U.S.C. § 283. In deciding a motion for a preliminary injunction in a patent infringement action, a district court should take into account the following factors: (1) the likelihood of success on the merits; (2) the likelihood of irreparable harm if an injunction were not granted; (3) the balance of hardships caused by granting or denying an injunction; and (4) the impact, if any, of an injunction on the public interest. *Payless Shoesource, Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 988 (Fed.Cir. 1993) (citing *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed.Cir.1988)); *We Care, Inc. v. Ultra–Mark Int'l Corp.*, 930 F.2d 1567, 1570 (Fed.Cir.1991). Because, as set forth below, Herbko has failed to show

that it is likely to succeed on the merits of this action, its motion is being denied insofar as it alleges infringement of its design patent.

■ A design patent "protects the non-functional aspects of an ornamental design as shown in the patent." *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed.Cir. 1995) (citing *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1450 (Fed.Cir.1993)). Design patent infringement requires a two pronged showing: first, the allegedly infringing design must be "substantially the same" as the patented design and second, the accused design must "appropriate the novelty that distinguished the patented design from the prior art." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124–25 (Fed.Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993); *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1565 (Fed.Cir.1988). Both tests, though often intertwined, must be satisfied in order to find infringement of a design patent. *Shelcore, Inc. v. Durham Indus., Inc.*, 745 F.2d 621, 628 n. 16 (Fed.Cir. 1984).

■ The oft repeated test for determining whether an allegedly infringing product is "substantially the same" as a design patent, originally pronounced by the Supreme Court, is as follows:

> [I]f, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.

*Elmer*, 67 F.3d at 1577 (quoting *Gorham Co. v. White*, 81 U.S. (14 Wall.) 511, 528, 20 L.Ed. 731 (1871)); *see also Payless Shoesource*, 998 F.2d at 990; *Braun Inc. v. Dynamics Corp. of Am.*, 975 F.2d 815, 819–20 (Fed.Cir.1992); *Avia Group Int'l*, 853 F.2d at 1565. The test for infringement, however, does not compare the commercial embodiments of the two products; instead, the allegedly infringing product is compared only to the patented design. *Sun Hill Indus., Inc. v. Easter Un-*

*limited, Inc.,* 48 F.3d 1193, 1196 (Fed.Cir. 1995).

■ In analyzing the visual similarity, a court may only consider whether an ordinary consumer would be deceived by the nonfunctional aspects of the design patent. *Elmer,* 67 F.3d at 1577 (quoting *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 825 (Fed.Cir.1992)). More specifically, the similarity must be attributed to the features protected by the patent—that is, the nonfunctional features that distinguish the patented device from the prior art. *Litton Sys., Inc. v. Whirlpool Corp.,* 728 F.2d 1423, 1444 (Fed.Cir.1984); *see also Sun Hill Indus.,* 48 F.3d at 1197; *Avia Group Int'l,* 853 F.2d at 1565; *FMC Corp. v. Hennessy Indus., Inc.,* 650 F.Supp. 688, 702 (N.D.Ill.1986), *aff'd in relevant part,* 836 F.2d 521, 527–28 (Fed.Cir.1987); *Black & Decker, Inc. v. North American Philips Corp.,* 632 F.Supp. 185, 191–92 (D.Conn. 1986); *cf. Knitwaves, Inc. v. Lollytogs Ltd.,* 71 F.3d 996, 1002 (2d Cir.1995) (discussing the substantial similarity test for copyright infringement).

■ Herbko claims that three features of its "CROSSWORD COMPANION" were both protected by its design patent and appropriated by Gemmy's "CROSSWORD CADDY": (1) the two "detents" on each end of the game holder that are shaped as elongated rounded depressions; (2) the concentric knobs on one side of both ends of the game board; and (3) the drawer outline which is positioned between the knobs. Even assuming that these features were protected (a point disputed by Gemmy and discussed below), the combination of these three features alone is insufficient to show a likelihood of success on the merits of Herbko's design patent infringement claim because an ordinary consumer is not likely to be deceived simply by these similarities. If an ordinary consumer were to be deceived, the deception would result from shared features of the products that are not protected by the design patent, including: (1) features that are not included in Herbko's patent, such as the color, size and material (plastic) of the two products; (2) aspects that are functional, such as the mechanism of advancing crossword puzzles and the crossword puzzles themselves; and (3) aspects that are included in the prior art, such as the screen and the general body design (but not the "dog bone" shape of Herbko's product). *See Sun Hill Indus.,* 48 F.3d at 1196–97; *FMC Corp.,* 650 F.Supp. at 688.

■ Furthermore, Gemmy claims that the three allegedly appropriated features are not even protected by Herbko's design patent because they are either functional or contained in the prior art, or both. Although Gemmy's proof on these allegations is short of compelling, it does raise sufficient issues to decrease the likelihood that Herbko would prevail in showing that Gemmy appropriated protected aspects of Herbko's design patent. The end detents are allegedly functional because they facilitate opening and closing the game board in order to replace the scrolls containing the crossword puzzles. Similarly, Gemmy argues that the drawer outline is functional because the drawer holds pencils and erasers and its size maximizes the usable space available between the knobs. (Sternberg Deposition, pp. 62–64.) Gemmy claims that the test for functionality is whether a feature performs any function at all. Although a feature that is "primarily functional" is not protected by a design patent, *see Avia Group Int'l,* 853 F.2d 1557, Gemmy's overly broad definition of functionality is not supported by the case law. Not all features that perform functions are primarily functional; rather, the test is whether the "function dictates a design," and that requires a court to determine whether the function performed by the features in question could be accomplished by other designs. *Id.*

It is clear that the detents could have been designed differently while still serving the same function. In fact, Gemmy itself provided proof of their nonfunctionality by presenting two additional versions of the "CROSSWORD CADDY" that do not have the same detents. (Defendant's Exhibits C & D.) One version has detents in a slightly different shape and the other has no detents at all. Gemmy claims that only 15 percent of its current inventory has the same detents as the "CROSSWORD COMPANION." (Tr. at 72–73.) Thus the design of the detents on

the "CROSSWORD COMPANION" appears to be nonfunctional.

The protectibility of the drawer outline is less clear. Gemmy argues that it is functional for reasons primarily attributable to the drawer itself. Herbko does not claim that the drawer itself is protected, presumably because it too believes that the drawer may be functional. Whether or not a drawer outline can be protected separately from the drawer itself is doubtful and decreases the likelihood that Herbko will succeed on the merits of this infringement action. Gemmy, however, also claims that the drawer is not novel because it is contained in the prior art. The prior art includes the Multiplay Magnetic Game Board, which is depicted in a black and white photocopy, and patents for two other game boards. (Dunne Decl., Exhibit A & B.) One of the patents is from France and its art work clearly shows a drawer outline. The other patent may also have a drawer outline, though the design is not as clear as the French patent. It is doubtful that Herbko could sufficiently differentiate its drawer outline from the prior art in order to bring this feature within the protection of its design patent and Herbko has failed to do so at this juncture.

Gemmy also claims that the concentric knobs are included in the prior art. Herbko claims its knobs are not part of the prior art, and instead are novel because they are "knurled knobs mounted having a radius of curvature the same as and concentric to the radius of curvature of the rounded ends of the holder, and having two circular [dimples] on the face of each knob ..." (Plaintiff's Reply Memorandum, p. 7.) The knurled and inner design aspects of the knobs are not present in the "CROSSWORD CADDY," and thus are irrelevant. Herbko relies most heavily on the fact that both products have knobs that are the same size and curvature as the game board. This feature, however, is also present in the prior art as exemplified by the Multiplay Magnetic Game Board, and thus Herbko has failed to show that these knobs are novel.

Accordingly, Herbko has failed to show a likelihood of success on either prong required to prove design patent infringement and thus

its motion for injunctive relief is denied insofar as the motion is based upon an allegation of design patent infringement.

### B. Trade Dress Infringement

 Herbko also claims that the trade dress of Gemmy's "CROSSWORD CADDY" infringes upon the trade dress of its "CROSSWORD COMPANION" in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). In order to enjoin allegedly infringing trade dress, a plaintiff must show (1) a likelihood of irreparable injury, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions on the merits and a balance of hardships tipping decidedly in plaintiff's favor. *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 967 (2d Cir.1995) (citations omitted). A presumption of irreparable harm arises from a showing of a high probability of confusion between the products in question. *Id.* at 967–68 (quoting *Omega Importing Corp. v. Petri–Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir.1971)).

 Trade dress is "the total image of a product and may include features such as size, shape, color or color combinations, texture [or] graphics." *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 75 (2d Cir.1985) (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 980 (11th Cir. 1983)); *see also Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1068 (2d Cir.1995); *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1005 (2d Cir.1995). In order to prevail on a trade dress claim, a plaintiff must show that its trade dress is either inherently distinctive or has acquired secondary meaning, and that a likelihood of confusion exists between plaintiff's and defendant's products. *Villeroy & Boch Keramische Werke K.G. v. THC Systems, Inc.*, 999 F.2d 619, 620 (2d Cir.1993); *Paddington Corp. v. Attiki Importers & Distrib., Inc.*, 996 F.2d 577, 582 (2d Cir.1993). "The trade dress of a product has attained 'secondary meaning' when the purchasing public associates that dress with a single producer or source rather than just with the product itself." *LeSportsac*, 754 F.2d at 78 (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456

U.S. 844, 851 n. 11, 102 S.Ct. 2182, 2186 n. 11, 72 L.Ed.2d 606 (1982)).

■ "While 'trade dress' at one time 'referred only to the manner in which a product was "dressed up" to go to market with a label, package, display card, and similar packaging elements,' the concept 'has taken on a more expansive meaning and includes the design and appearance of the product as well as that of the container and all elements making up the total visual image by which the product is presented to customers.' *Knitwaves,* 71 F.3d at 1005 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir.1995)); *Landscape Forms, Inc. v. Columbia Cascade Co.,* 70 F.3d 251, 253 (2d Cir.1995). In a product design claim, the traditional trademark and trade dress analysis (which requires determining whether the mark or dress is generic, descriptive, suggestive, or arbitrary or fanciful) does not apply. *See Knitwaves,* 71 F.3d at 1007. Instead, the test to determine whether a product qualifies for protection for trade dress inherent in the product's design is whether the trade dress is "likely to serve primarily as a designator of origin of the product," as opposed to serving primarily aesthetic purposes. *Knitwaves,* 71 F.3d at 1008 (quoting *Duraco Prods., Inc. v. Joy Plastic Enters., Ltd.,* 40 F.3d 1431, 1449 (3d Cir.1994)); *see also Banff Ltd. v. Express, Inc.,* No. 93 Civ. 2514, 1996 WL 2003, at *6 (S.D.N.Y. Jan. 3, 1996).

Under this test, it is no longer enough for a plaintiff to "demonstrate that the appearance of its product serves some source identifying function"; rather, the plaintiff must show that "the primary purpose behind the design was to identify its product's source." *Banff,* 1996 WL 2003, at *6. In determining the producer's intent, it is helpful to look at the standards of the industry in order to determine "whether the design, shape or combination of elements is so unique, unusual or unexpected in this market that one can assume without proof that it will automatically be perceived by customers as an indici[um] of origin." *Krueger Int'l, Inc. v. Nightingale Inc.,* 915 F.Supp. 595, 603 (S.D.N.Y.1996)

(quoting 1 McCarthy, *Trademarks and Unfair Competition* § 8.02[4] ).

■ Herbko asserts that the trade dress of the "CROSSWORD COMPANION" is inherently distinctive and offers in support the deposition testimony of its president, Herbert Sternberg. In describing what was allegedly novel about the "CROSSWORD COMPANION," Sternberg testified as follows:

> The whole look, the whole design, the ornamentation, the whole concept, the roundness, the space, the futuristic, the free look of it and the ornamentation that you can see from the drawing. I wanted—the concept, the holes, the dial, the rollers looked like the part of this concept that you can see, the ovals that are on both ends, the sleekness of the graduation of it, the way it is. This took a lot of time and effort to make it so that it stood by itself alone in the marketplace.

(Sternberg Deposition, pp. 20–21.) Herbko claims that Sternberg's statements show that he designed the "CROSSWORD COMPANION" for the primary purpose of identifying its source. Sternberg's statements, however, could also suggest that he designed the "CROSSWORD COMPANION" in order to make it aesthetically pleasing. Furthermore, Herbko has not shown that its design is "unique, unusual or unexpected"; in fact, the design can certainly be viewed as part of a direct progression from, or a "mere refinement" of, the prior art. *See Krueger Int'l,* 915 F.Supp. at 603 (quoting *Seabrook Foods, Inc. v. Bar–Well Foods Ltd.,* 568 F.2d 1342, 1344 (C.C.P.A.1977)). In sum, the product configuration of the "CROSSWORD COMPANION" appears to enhance the product's aesthetic value, rather than identify the source of the product.

Accordingly, Herbko has failed to meet its burden for a preliminary injunction with regard to its claim that the trade dress of the "CROSSWORD COMPANION" is inherently distinctive.

■ Herbko, however, also claims that the "CROSSWORD COMPANION" has acquired secondary meaning. Gemmy claims that a finding of secondary meaning is pre-

cluded as a matter of law absent survey evidence or empirical studies. In support of this argument, Gemmy relies upon *Braun Inc. v. Dynamics Corp. of Am.,* 975 F.2d 815, 827 (Fed.Cir.1992), a case which stands for the unremarkable proposition that survey evidence or the lack of it is a relevant factor. Herbko's failure to produce such evidence thus weighs against a finding of secondary meaning but by no means precludes it. *See LeSportsac,* 754 F.2d at 78 (citing *Thompson Medical Co., Inc. v. Pfizer Inc.,* 753 F.2d 208, 217 (2d Cir.1985)).

In determining whether the "CROSSWORD COMPANION" has acquired secondary meaning, the Court must assess, in addition to consumer studies or surveys, such factors as advertising expenditures, sales success, unsolicited media coverage of the product, attempts to plagiarize, and the length and exclusivity of use. *Mana Prods.,* 65 F.3d at 1071; *Thompson Medical,* 753 F.2d at 217. These factors, however, only guide the analysis; ultimately, Herbko must show that the consuming public has come to identify the design of the "CROSSWORD COMPANION" with its maker, *see Mana Prods.,* 65 F.3d at 1071; *Braun,* 975 F.2d at 826, and proof of secondary meaning "entails rigorous evidentiary requirements," *Thompson Medical,* 753 F.2d at 217 (quoting *Ralston Purina Co. v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 134 (S.D.N.Y.1972)).

Herbko claims that it spent more than $500,000 advertising its "CROSSWORD COMPANION" in catalogs, magazines and newspapers. (Sternberg Aff., ¶ 8; Sternberg Reply Aff., ¶ 4.) Gemmy retorts that this figure is misleading because most of Herbko's advertising expenditures represent discounts given to retailers in exchange for space in the retailer's advertisements, and that a more accurate figure is approximately $100,000. (Tr. at 78–79; Sternberg Deposition, pp. 179–85.) Furthermore, Herbko did not present any evidence to show that these advertisements encouraged consumers to associate the design of the "CROSSWORD COMPANION" with its source. *Krueger Int'l,* 915 F.Supp. at 608; *see also Braun,* 975 F.2d at 826–27 (citing *First Brands Corp. v. Fred Meyer, Inc.,* 809 F.2d 1378, 1383 (9th Cir.1987); *American Footwear Corp. v. General Footwear Co.,* 609 F.2d 655, 663 (2d Cir.1979), *cert. denied,* 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980)); *Merit Diamond Corp. v. Suberi Bros., Inc.,* No. 94 Civ. 4572, 1996 WL 11192, at *4 (S.D.N.Y. Jan. 11, 1996) (citing *Co–Rect Prods., Inc. v. Marvy! Advertising Photography, Inc.,* 780 F.2d 1324, 1332 (8th Cir.1985)). The advertisements Herbko submitted in support of its motion for a preliminary injunction do not appear to highlight the product's trade dress or to serve a source identifying function. (Sternberg Aff., Exhibit 5); *see Krueger Int'l,* 915 F.Supp. at 609 (citing *Coach Leatherware Co. v. AnnTaylor, Inc.,* 933 F.2d 162, 168 (2d Cir.1991)).

Herbko also presented a number of articles written about the "CROSSWORD COMPANION" in publications such as *Entrepreneur Magazine, New Woman Magazine, The Chicago–Sun Times, Daytona Beach News Journal* and *The Tennessean* as proof of unsolicited media coverage. (Sternberg Reply Aff., ¶¶ 8–9 & Exhibits B, D.) Gemmy concedes that these articles may have been unsolicited by (or at least without cost to) Herbko itself, but claims that the *New York Times,* which is associated with the "CROSSWORD COMPANION," issued press releases and otherwise solicited these articles. (Tr. at 97; Sternberg Reply Aff., Exhibit D.)

As noted above, the "CROSSWORD COMPANION" had retail sales of approximately $3 million in 1994 and $12 million for 1995. (Sternberg Aff., ¶ 1; Sternberg Reply Aff., ¶ 3.) Furthermore, Herbko relies on Gemmy's concession that it was aware of the "CROSSWORD COMPANION" when it created the "CROSSWORD CADDY" as well as the statement by Gemmy's marketing manager, Meredith Harrison, that Gemmy has not spent any money advertising or promoting its product to show that the "CROSSWORD COMPANION" achieved a secondary meaning that Gemmy desired to plagiarize. *See LeSportsac, Inc. v. K Mart Corp.,* 607 F.Supp. 183, 185–86 (E.D.N.Y.1984) (citations omitted), *aff'd,* 754 F.2d 71 (2d Cir.1985). Gemmy claims that while it did not spend money on advertisements, it too gave discounts to retailers in exchange for coverage

in the retailers' own advertisements. Finally, Herbko claims that it was able to achieve this success in a fairly short period of time—approximately one year—and that its sales figures are proof of the success in achieving secondary meaning for the "CROSSWORD COMPANION." *Compare L.A. Gear,* 988 F.2d at 1130 *with Braun,* 975 F.2d at 826.

Although "mass exposure" and rapidly achieved sales figures can support a finding of secondary meaning, *see L.A. Gear,* 988 F.2d 1117, 1130 (Fed.Cir.1993), Herbko has failed to present evidence rising to this level. When considered with the lack of survey evidence and the relatively short period of time on the market, Herbko has failed to establish that the "CROSSWORD COMPANION" has achieved secondary meaning in the marketplace. *See Braun,* 975 F.2d at 826–27.

In sum, Herbko has failed to show that the trade dress of its "CROSSWORD COMPANION" either is inherently distinctive or has achieved secondary meaning and has thus failed to show that it is entitled to protection under the Lanham Act. This being so, it is not necessary, at this time, to consider Gemmy's defense that Herbko's design is not protectible trade dress because it is functional, *see Landscape Forms,* 70 F.3d at 253; *Wallace Int'l Silversmiths, Inc. v. Godinger Silver Art Co.,* 916 F.2d 76, 79 (2d Cir.1990), *cert. denied,* 499 U.S. 976, 111 S.Ct. 1622, 113 L.Ed.2d 720 (1991), or the likelihood of confusion between the products.

Accordingly, Herbko has shown neither a likelihood of success on its claim for trade dress infringement nor raised a serious question for litigation, and its motion for a preliminary injunction is denied insofar as that motion is based upon an allegation of trade dress infringement.

## C. *False Advertising*

Herbko also claims that it is entitled to injunctive relief because Gemmy's packaging of the "CROSSWORD CADDY" constitutes false advertising in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Herbko claims that Gemmy's packaging contains an illustration of a game board that more closely resembles Herbko's "CROSS-WORD COMPANION" than Gemmy's "CROSSWORD CADDY." Gemmy responds that the illustration represents an earlier model of the "CROSSWORD CADDY" than the one currently being sold.

■ False advertising under the Lanham Act "does not apply merely to false advertising through traditional media channels, but to a broad range of deceptive statements made in connection with the sale of goods or services." *Radio Today, Inc. v. Westwood One, Inc.,* 684 F.Supp. 68, 74 (S.D.N.Y.1988) (citing *Consumers Union of the United States, Inc. v. The New Regina Corp.,* 664 F.Supp. 753, 764 (S.D.N.Y.1987)); *see also Resource Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.,* 926 F.2d 134, 139 (2d Cir.1991); *Vibrant Sales, Inc. v. New Body Boutique, Inc.,* 652 F.2d 299, 304 (2d Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1988).

■ In order to prevail on this claim, Herbko must demonstrate that Gemmy's advertisement "is either literally false or that the advertisement, though literally true, is likely to mislead and confuse consumers." *Castrol, Inc. v. Quaker State Corp.,* 977 F.2d 57, 62 (2d Cir.1992) (quoting *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d Cir.1991) (quoting *Coca–Cola Co. v. Tropicana Prods., Inc.,* 690 F.2d 312, 317 (2d Cir.1982))). "Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim 'without reference to the advertisement's impact on the buying public.'" *Id.; PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 272 (2d Cir.1987). A plaintiff proceeding on an implicit falsity theory, however, must present evidence of the reaction of purchasers to the advertisement. *See SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson–Merck Consumer Pharmaceuticals Co., Inc.,* 906 F.Supp. 178, 181 (S.D.N.Y.1995), *aff'd,* No. 95–9240, 1996 WL 37325 (2d Cir. Jan. 30, 1996) (Table); *Avon Prods., Inc. v. S.C. Johnson & Son, Inc.,* No. 94 Civ. 3958, 1994 WL 267836, at *8 (S.D.N.Y. Jun. 15, 1994).

■ Although Herbko claims that Gemmy's illustration is both literally and implic-

itly false, its arguments appear to proceed only on an implicit falsity theory. Gemmy's illustration on its packaging differs from its product in three aspects: (1) the crossword puzzle in the illustration is presented vertically on the game board (as in the "CROSSWORD COMPANION") whereas the crossword puzzle in the product is presented horizontally; (2) the illustration has knurled knobs with the same line and dimples as the "CROSSWORD COMPANION"; and (3) the "CROSSWORD CADDY" name appears on Gemmy's product but not in the illustration. The illustration, however, is of the "CROSSWORD CADDY" and therefore is not literally false. Furthermore, the box contains a warning stating that the "item may not appear exactly as shown." (Plaintiff's Exhibit 14.)

As noted above, Herbko also claims that the advertisement is implicitly false and that consumers are likely to be confused and deceived. Herbko's proof of this claim is insufficient. In order to show confusion and deception, a plaintiff must ordinarily present a consumer reaction survey. *Avon Prods.*, 1994 WL 267836, at *8 (quoting *American Express Travel Related Serv. v. Mastercard Int'l Inc.*, 776 F.Supp. 787, 792 (S.D.N.Y. 1991) (citing *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 386 (2d Cir. 1986))). On an application for a preliminary injunction, however, a "full-blown survey" is not always necessary and expert testimony or any other qualitative showing that "a not insubstantial number of consumers received a false or misleading impression from it" may be sufficient. *SmithKline Beecham Consumer Healthcare*, 906 F.Supp. at 181 (collecting cases).

In support of its contention, Herbko presents an affidavit of Mark Dawahare, a gift buyer for a department store in Lexington, Kentucky stating that he saw an advertisement for the "CROSSWORD CADDY" run by another department store and "was confused into thinking that that product was the same as the product I was purchasing from Herbko." (Dawahare Aff., ¶¶ 3, 7.) Dawahare does not, however, state that his confusion was caused by the illustration on Gemmy's packaging or that he was even aware of

that illustration; rather, Dawahare's affidavit could be interpreted to mean nothing more than he was confused because the two products were similar crossword puzzle games. Herbko also presented a letter from Russell Maize at May Merchandising Company stating:

> I'm confused over this recent Macy's colored ad on the "Crossword Caddy" at $14.99 from Random House. This puzzle looks too much like our Crossword Companion that retails at $19.99. I thought you had the patent on this design? I'm concerned that our customers are not going to understand the difference between the two and May Department Stores will have to start reducing retails greatly affecting our margins. Please review this ad and call me ASAP to discuss our direction.

(Sternberg Reply Aff., Exhibit A.) This letter shows Maize's concern about the similarity of the products but it does not support a finding of consumer confusion and deception.

At this juncture, Herbko has not established a likelihood of success or serious issues going to the merits of its false advertising claim.

### III. *CONCLUSION*

For the reasons set forth above, Herbko has not satisfied its burden for a preliminary injunction on its claims of design patent infringement, trade dress infringement or false advertising and its motion seeking injunctive relief is denied.

SO ORDERED.